

# NOT FOR PUBLICATION

FILED

SEP -26 2006
3

CLERK U.S. BANKRUPTCY COURT
CENTRAL DISTRICT OF CALIFORNIA
BY_____ Deputy Clerk

## UNITED STATES BANKRUPTCY COURT

## CENTRAL DISTRICT OF CALIFORNIA

### RIVERSIDE DIVISION

| | |
|---|---|
| In re: | Case No. RS 02-26263 PC |
| INLAND GLOBAL MEDICAL GROUP, INC., | Adversary No. RS 04-02194 PC |
| Debtor. | |
| | Chapter 7 |
| RICHARD K. DIAMOND, CHAPTER 7 TRUSTEE, | |
| Plaintiff, | Date: May 30, 2006 |
| v. | Time: 9:00 a.m. |
| INLAND CARDIOLOGY MEDICAL ASSOCIATES, | Place: U.S. Bankruptcy Court<br>Courtroom #303<br>3420 Twelfth Street<br>Riverside, CA |
| Defendant. | |

ENTERED

SEP - 7 2006

## MEMORANDUM DECISION

In this adversary proceeding, Plaintiff, Richard K. Diamond, Chapter 7 Trustee ("Diamond") seeks a judgment declaring that a transfer to or for the benefit of Defendant, B. Don Ahn, M.D. Inc., a California corporation doing business as Inland Cardiology Medical Associates ("ICMA"), made within 90 days before an involuntary petition was filed in the above referenced case constitutes a preference avoidable under § 547(b). ICMA asserts the affirmative defenses afforded by § 547(c)(2) and (c)(4). Trial was conducted on May 30, 2006, at which Sandor T. Boxer appeared for Diamond and Stephen R. Wade appeared for ICMA. After closing arguments, the matter was taken under submission pending the receipt of post-submission briefs by Diamond and ICMA. The court, having considered the pleadings, evidentiary record, trial briefs, post-

1 | submission briefs and arguments of counsel, makes the following findings of fact and

2 | conclusions of law[1] pursuant to Fed. R. Civ. P. 52, as incorporated into Fed. R. Bankr.

3 | P. 7052.

4 | ## I. STATEMENT OF FACTS

5 | On October 4, 2002, an involuntary chapter 7 petition was filed against Inland

6 | Global Medical Group, Inc. ("Inland Global"), in Case No. RS 02-26263 PC, styled

7 | Inland Global Medical Group, Inc., Debtor, in the United States Bankruptcy Court,

8 | Central District of California, Riverside Division.  An order for relief under chapter 7 was

9 | entered on December 27, 2002.  Diamond is the duly elected chapter 7 trustee of the

10 | bankruptcy estate of Inland Global, and has standing to pursue the causes of action

11 | alleged in the complaint filed in this adversary proceeding on behalf of such estate.

12 | During the 90-days preceding the petition date, ICMA received three payments

13 | from Inland Global totaling $115,565.50: (1) Check # 70678 in the amount of

14 | $51,073.80 dated July 24, 2002; (2) Check # 70719 in the amount of $16,296.10 dated

15 | August 8, 2002, and (3) Check # 71374 in the amount of $48,195.60 dated September

16 | 12, 2002.

17 | On or about July 24, 2002, Inland Global wrote Check # 70678 in the amount of

18 | $51,073.80, payable to ICMA dated July 24, 2002.  The check was paid or honored on

19 | July 29, 2002.  At trial, Diamond conceded that Check # 70678 was a "capitation

20 | payment" that was made for capitated services rendered by ICMA for Inland Global

21 | during the month of July 2002, and that ICMA had an affirmative defense under §

22 | 547(c)(2) to his recovery of Check # 70678.  Diamond acknowledged that the July

23 | capitation check was paid by Inland Global to ICMA in the ordinary course of business

24 |

25 | [1] To the extent that any finding of fact is construed to be a conclusion of law, it is hereby adopted as such.

26 | To the extent that any conclusion of law is construed to be a finding of fact, it is hereby adopted as such. The court reserves the right to make additional findings and conclusions as necessary or as may be

27 | requested by any party.

1    pursuant to ordinary business terms.

2       On or about August 8, 2002, Inland Global wrote Check # 70719 in the amount of

3    $16,296.10 dated August 8, 2002.  The check was paid or honored on August 19, 2002.

4    At trial, Diamond conceded that Check # 70719 was a "fee for service" payment and

5    that ICMA had an affirmative defense to his recovery of Check # 70719 under §

6    547(c)(4), *i.e.*, that ICMA provided services on behalf of Inland Global after receiving

7    Check # 70719 which constituted "new value" in excess of the transfer sought to be

8    avoided.

9       On or about September 12, 2002, Inland Global wrote Check # 71374 in the

10    amount of $48,195.60 dated September 12, 2002.  The check was paid or honored on

11    September 16, 2002.  Diamond and ICMA agree that Check # 71374 was made as a

12    "capitation payment" to compensate ICMA for capitated services rendered during the

13    month of August 2002, but the parties dispute whether either § 547(c)(4)'s "new value"

14    defense or § 547(c)(2)'s "ordinary course defense" prevent its recovery as a preference

15    by the trustee.

16       Both parties focused their post-submission briefs on the issue of whether Check

17    # 71374 was paid in the ordinary course of business according to ordinary business

18    terms.  ICMA concedes that ultimate payment for its August capitated services was

19    received nearly three weeks late, but contends that Check # 71374 was paid in the

20    ordinary course of business according to ordinary business terms, reasoning that:

21       "[t]he capitation check for the month of August, 2002 was originally sent by Inland
        Global in late August, 2002, however, it was inadvertently switched with a check
22      payable to another provider of Inland Global with a similar name in Redlands,
        California, such that [ICMA] received that entities [sic] check by mistake.  That
23      mistake was rectified by the mailing of check number 71374 to [ICMA] when the
        error was brought to the attention of Inland Global.[2]
24
25    Diamond disagrees, observing that all prior capitation payments were received by ICMA

26    ─────────────────

27    [2] ICMA's Supplemental Trial Brief, p.3, l.12-16.

1   from Inland Global during the month for which the services were rendered at or about

2   the same date each month and that Check # 71374 was not an ordinary course

3   payment due to its three-week delay. Thus, the only remaining issues before the court

4   are (1) whether ICMA provided services to or for the benefit of Inland Global after

5   receiving Check # 71374 which constituted "new value" in excess of the transfer sought

6   to be avoided, or alternatively, (2) whether Inland Global's issuance of Check # 71374

7   on September 12, 2002, as a replacement check for ICMA's timely August capitation

8   payment which had been inadvertently mailed to another creditor, caused the transfer to

9   fall outside the ordinary course of business.

10                          II. DISCUSSION

11          This court has jurisdiction over this adversary proceeding pursuant to 28 U.S.C.

12   §§ 157(b) and 1334(b). This matter is a core proceeding under 28 U.S.C. §

13   157(b)(2)(A), (F) and (O). Venue is appropriate in this court. 28 U.S.C. § 1409(a).

14   A.    Section 547(c)(4)

15          Section 547(c)(4) states that the trustee may not avoid under § 547 a transfer to

16   or for the benefit of a creditor, to the extent that, after such transfer, such creditor gave

17   new value to or for the benefit of the debtor –

18          (A) not secured by an otherwise unavoidable security interest; and

19          (B) on account of which new value the debtor did not make an otherwise

20          unavoidable transfer to or for the benefit of such creditor.

21   11 U.S.C. § 547(c)(4). To prevail with the new value defense, a defendant must show

22   (a) that it gave unsecured new value to or for the benefit of the debtor; (b) after the

23   preferential transfer; and (c) the debtor did not repay the new value by an otherwise

24   unavoidable transfer. Mosier v. Ever-Fresh Food Co. (In re IRFM, Inc.), 52 F.3d 228,

25   231-32 (9th Cir. 1995).

26          "The 'new value' defense is grounded in the principle that the transfer of new

27
                                    - 4 -

1    value to the debtor will offset the payments, and the debtor's estate will not be depleted

2    to the detriment of other creditors."  Rodgers v. Schneider (In re Laguna Beach Motors,

3    Inc.), 148 B.R. 322, 324 (9th Cir. BAP 1992), quoting In re Auto-Train Corp., 49 B.R.

4    605, 612 (D.D.C. 1985), aff'd sub nom., Drabkin v. A.I. Credit Corp., 800 F.2d 1152

5    (D.C. Cir. 1986).

6          In this case, the only evidence of new value given after the date of Check #

7    71374 is the testimony of ICMA's office manager, Karen Stevens ("Stevens"), who is

8    responsible for ICMA's billing and accounts receivable.  Stevens testified:

9        "In September, 2002, and until October 4, 2002 when this bankruptcy case was
    filed, [IMCA] continued to perform capitation services for patients of Inland Global

10       at the same rate as in the previous two months. [ICMA] has not been paid for
    such services from Inland Global or any other source."[3]

11   ICMA did not offer any evidence concerning the nature and extent of the capitated

12   services actually performed between September 12, 2002 and October 4, 2002, nor

13   whether such treatment was authorized by Inland Global.  Indeed, Stevens admitted on

14   cross-examination that ICMA did not maintain an internal record of its capitated services

15   rendered to or for the benefit of Inland Global.  On direct examination, Stevens

16   explained that ICMA relied on Inland Global's accounting of capitated services when it

17   received payment for such services, stating that:

18       "[ICMA] was usually paid near the end of each calendar month for services
    rendered during that month.  Included with the check from Inland Global for

19       capitated services in such month was an accounting which established the

20       number or patients lives compensated broken down by insurer."[4]

21   Without Inland Global's accounting, there is no way of measuring the value of capitated

22   services ostensibly rendered by ICMA to Inland Global after September 4, 2002.

23

24   [3] Declaration of Karen Stevens in Lieu of Direct Testimony at Trial, p.4, l.9-12.

25   [4] Declaration of Karen Stevens in Lieu of Direct Testimony at Trial, p.3, l.22-24. The Specialty Capitation
accountings from Inland Global to ICMA for the months of July 2002 and August 2002 were admitted as

26   Defendant's Exhibit C.  ICMA did not offer a similar accounting for the period of September 1, 2002
through October 4, 2002.

27

1    The defendant in a preferential transfer proceeding has the burden of proving

2    any exceptions to avoidance under § 547(c).  11 U.S.C. § 547(g).  See Marshack v.

3    Orange Commercial Credit (In re Nat'l Lumber & Supply, Inc.), 184 B.R. 74, 75 (9th Cir.

4    BAP 1995).  With respect to § 547(c)(4), creditors have the burden of establishing with

5    specificity the measure of new value given to the debtor in the exchange.  See, e.g.,

6    Official Unsecured Creditors' Comm. v. Airport Aviation Servs., Inc. (In re Arrow Air,

7    Inc.), 940 F.2d 1463, 1466 (11th Cir. 1991); Creditors' Comm. v. Spada (In re Spada),

8    903 F.2d 971, 976 (3rd Cir. 1990); Jet Florida, Inc. v. Am. Airlines, Inc. (In re Jet Florida

9    Sys., Inc.), 861 F.2d 1555, 1559 (11th Cir. 1988).  Creditors relying on § 547(c)(4) must

10    also prove that the new value has not been repaid by an otherwise unavoidable

11    transfer.  See IRFM, 52 F.3d at 231; Nat'l Lumber, 184 B.R. at 81.  Having failed to

12    establish with specificity the new value given to Inland Global and that the new value

13    was not repaid by an otherwise unavoidable transfer, ICMA is not entitled to a new

14    value defense against Diamond's preference claim for recovery of Check # 71374.

15    B.    Section 547(c)(2)

16    Under § 547(c)(2), a trustee may not avoid an otherwise preferential transfer to

17    or for the benefit of a creditor to the extent that such a transfer was –

18    (A) in payment of a debt incurred by the debtor in the ordinary course of business

19    or financial affairs of the debtor and the transferee;

20    (B) made in the ordinary course of business or financial affairs of the debtor and

21    the transferee, and

22    (C) made according to ordinary business terms.

23    11 U.S.C. § 547(c)(2)

24    Section 547(c)(2) is comprised of a subjective test and an objective test.  See

25    Cocolat,.Inc. v. Fisher Dev., Inc. (In re Cocolat, Inc.), 176 B.R. 540, 549 (Bankr. N.D.

26    Cal. 1995).  The transferee has the burden of proving the defense and must prove each

27

- 6 -

1  of the three elements by a preponderance of the evidence.  <u>Arrow Elec., Inc. v. Justus</u>

2  <u>(In re Kaypro)</u>, 230 B.R. 400, 404 (9th Cir. BAP 1999), <u>aff'd in part, rev'd in part</u>, 218

3  F.3d 1070 (9th Cir. 2000).

4        1. <u>Ordinary Course of Business</u>

5        Section 547(c)(2)(A) & (B), which together form the subjective test, require a

6  creditor to demonstrate that the debt and its payment are ordinary in relation to past

7  practices or a prior course of dealing between the debtor and the creditor.  <u>See, e.g.</u>,

8  <u>Sulmeyer v. Suzuki (In re Grand Chevrolet, Inc)</u>, 25 F.3d 728, 732 (9th Cir. 1994); <u>Bell</u>

9  <u>Flavors & Fragrances, Inc. v. Andrew (In re Loretto Winery, Ltd.)</u>, 107 B.R. 707, 709

10  (9th Cir. BAP 1989); <u>Cocolat</u>, 176 B.R. at 549.

11        Section 547(c)(2)(A) focuses on whether the incurrence of debt was ordinary,

12  <u>i.e.</u>, whether the debt was incurred by the debtor in the ordinary course of business.

13  <u>See</u> <u>Cocolat</u>, 176 B.R. at 549.  Section 547(c)(2)(B) requires the court to examine the

14  following factors to determine if payment of the debt was ordinary in light of past

15  practices between debtor and creditor: (1) the length of time the parties were engaged

16  in the transactions at issue; (2) whether the amount or form of tender differed from past

17  practices; (3) whether the debtor or creditor engaged in any unusual collection or

18  payment activity; and (4) whether the creditor took advantage of the debtor's

19  deteriorating financial condition. <u>See</u> <u>Grand Chevrolet</u>, 25 F.3d at 732; <u>Cocolat</u>, 176

20  B.R. at 549.

21        In this case, the first prong of § 547(c)(2) is satisfied.  There is no material

22  dispute that Check # 71374 was in payment of a debt incurred by Inland Global in the

23  ordinary course of Inland Global's business.  11 U.S.C. § 547(c)(2)(A).  The court

24  further finds that ICMA has met the second prong of § 547(c)(2)'s subjective test, <u>i.e.</u>,

25  that payment of the debt was ordinary in light of past practices between ICMA and

26  Inland Global.  Generally, capitation payments were made by Inland Global to ICMA

27                               - 7 -

1   during the month for which the services were rendered, and such payments were

2   received by ICMA on or about the same date each month.  In July 2002, for example,

3   Inland Global paid ICMA for its capitated services that month by Check # 70678 dated

4   July 24, 2002.  Neither party disputes that such payment was ordinary in light of past

5   practices between the parties.

6         In August 2002, ICMA rendered capitation services to Inland Global and Inland

7   Global followed the same practice to pay for such services.  According to the evidence,

8   Inland Global issued a check to ICMA toward the end of August 2002 in payment of

9   capitated services rendered by ICMA to Inland Global during the month.  In August,

10  ICMA received a check from Inland Global for the August capitation services.  The

11  amount and form of tender did not differ from past practices, except that the check

12  received was payable to another provider and ICMA's check was sent to an incorrect

13  address.  Stevens testified that Inland Global's original capitation check for the month of

14  August 2002 was inadvertently switched with a check payable to another provider with a

15  similar name.[5]  Inland Global rectified the mistake by sending Check # 71374 to ICMA

16  on September 12, 2002.

17        Diamond correctly observes that the August 2002 capitation payment was the

18  only capitation payment <u>received</u> by ICMA outside the normal billing practice between

19  the parties.  But Inland Global's initial <u>payment</u> of ICMA's August capitation services

20  was consistent with the prior course of dealing between the parties.  Inland Global's

21  original check was issued timely.  The original check was timely received by ICMA.  The

22  delay in actual payment was caused by the misdirection of the original check

23  necessitating the mailing a second check.  Except for the mistake in mailing the original

24  _____

25  [5]  According to Stevens' testimony at trial, a check for the August 2002 capitation payment was received
    around August 24 or 25, 2002.  However, it was addressed to "Inland Cardiology Group" or something

26  similar.  Ms. Stevens further testified that since that check was addressed to a different entity, that check
    was returned to Inland Global "and it took'em [until mid-September] to get another check."  FTR

27  Transcript, 10:54:00.

- 8 -

1    check, there is no evidence of unusual collection or payment activity nor is there any

2    evidence that ICMA sought to take advantage of Inland Global's deteriorating financial

3    condition.[6]  Weighed in light of the subjective test set forth in <u>Grand Chevrolet</u>, the court

4    finds that the foregoing factors tip narrowly in favor of ICMA.

5            2. <u>Ordinary Business Terms</u>

6            Section 547(c)(2)(C)'s objective test requires a creditor to prove that the payment

7    was ordinary in relation to prevailing business standards.  <u>See, e.g., Ganis Credit Corp.</u>

8    <u>v. Anderson (In re Jan Weilert RV, Inc.)</u>, 315 F.3d 1192, 1197 (9th Cir. 2003); <u>In re Food</u>

9    <u>Catering & Housing, Inc.</u>, 971 F.2d 396, 398 (9th Cir, 1992).  In other words, §

10   547(c)(2)(C)'s objective standard requires proof of "practices common to businesses

11   similarly situated to the debtor and the transferee." <u>Loretto Winery</u>, 107 B.R. at 709.  It

12   is not enough to prove what past practices were between the particular creditor and the

13   debtor. <u>Id</u>. The focus of the inquiry is whether the payment practice at issue comports

14   with industry standards.  <u>See</u> <u>Jan Weilert</u>, 315 F.3d at 1197.

15           Section 547(c)(2)(C)'s objective test requires consideration of both the creditor's

16   and the debtor's industries, <i>i.e.</i>, "the <u>broad range</u> of terms that encompasses the

17   practices employed by those debtors and creditors, including terms that are ordinary for

18   those under financial distress." <u>Jan Weilert</u>, 315 F.3d at 1198 (citations omitted).

19   According to the Ninth Circuit:

20           [T]he creditor must show that the payment he received was made in accordance
             with the ordinary business terms in the industry.  But this does not mean that the
21           creditor must establish the existence of some single, uniform set of business
             terms . . . .  We conclude that "ordinary business terms" refers to the <u>range</u> of
22           terms that encompasses the practices in which firms similar in some general way
             to the creditor in question engage, and that only dealings so idiosyncratic as to
23           fall outside that broad range should be deemed extraordinary and therefore
             outside the scope of [the ordinary course of business].

24   _____

25   [9] There is also no evidence that the original check to ICMA was dishonored for insufficient funds.  Checks
     dishonored for insufficient funds generally do not fall within the ordinary course of business. <u>See, e.g.,</u>
26   <u>Matter of Anderson-Smith & Assocs., Inc.</u>, 188 B.R. 679, 686 (Bankr. N.D. Ala. 1995); <u>Pressman v.</u>
     <u>Rodemich (In re So Good Potato Chip Co.)</u>, 137 B.R. 330, 331 (Bankr. E.D. Mo. 1992).
27

1 | Id., quoting In re Tolona Pizza Prods. Corp., 3 F.3d 1029, 1033 (7th Cir. 1993).

2 | With respect to the third element of § 547(c)(2), Diamond correctly points out that

3 | ICMA was required to offer some evidence of industry standards to sustain its burden

4 | under § 547(c)(2(C). In re Hessco Indus., Inc., 295 B.R. 372, 376 (9th Cir. BAP 2003);

5 | Loretto Winery, 107 B.R. at 709. ICMA did not offer evidence concerning the normal

6 | practices in the industry with regard to payment, including late payments and

7 | misdirected payments. In particular, ICMA did not offer any evidence upon which the

8 | court could base a finding that Inland Global's issuance of Check # 71374 on

9 | September 12, 2002, as a replacement check for ICMA's timely August capitation

10 | payment that had been inadvertently mailed to another creditor, was consistent with

11 | ordinary business practices among capitation medical providers in the profession.[7]

12 | The purpose and policy underlying § 547(c)(2)(C)'s evidentiary requirement was

13 | explained in the Eleventh Circuit's decision reversing Miller v. Florida Mining & Materials

14 | (In re A.W. Assocs., Inc.), 196 B.R. 900 (Bankr. N.D. Fla. 1996), a bankruptcy court

15 | decision cited by ICMA.[8] In that case, the trustee sought to avoid as a preferential

16 | transfer a payment of $6,131.05 made by the debtor within 90 days prior to bankruptcy

17 | in payment of five invoices dated January 29, 1993 through February 4, 1993. Each

18 | invoice stated that payment was due on the tenth of the month following the month of

19 | the deliveries identified in the invoice. Therefore, the first invoice dated January 29,

20 | 1993, in the amount of $2,626.29 was due on February 10, 1993, and payment for the

21 | remaining invoices was due not later than March 10, 1993. The debtor, however, had a

22 | consistent history of late payments to the creditor. Indeed, the evidence established

23 | that the debtor had timely paid only 13 of 61 invoices sent by the creditor between April

24 | —————————————————

25 | [7] Nor was there testimony or other evidence explaining the ultimate disposition of the original check issued
by Inland Global to ICMA.

26 |

27 | [8] ICMA's Supplemental Trial Brief, p.5, l.5-7.

1    27, 1992 and January 29, 1993.  The debtor's practice of "batching" invoices for

2    payment by a single check contributed to the delay in payment.  Notwithstanding the

3    debtor's chronic late payments, the creditor continued to make deliveries to the debtor.

4    When checks were returned for insufficient funds, the creditor routinely resubmitted the

5    checks for payment without suspending deliveries or taking extraordinary action to

6    collect the debt.  The bankruptcy court held that the transfer was excepted from

7    avoidance under § 547(c)(2), stating that "[g]iven the surrounding facts and

8    circumstances, the March 10, 1993 payment was made according to ordinary business

9    terms."  Id. at 906.  The court further held that "[t]he payment was not received as a

10   result of extraordinary collection efforts."  Id. at 907.   In so holding, the bankruptcy court

11   ruled that § 547(c)(2)'s exception hinges upon "upon the debtor's internal operations

12   and the circumstances of the transaction in question, not industry standards."  Id. at

13   905.  The district court affirmed, holding that the payment was made in the ordinary

14   course of business even if industry standards are considered.  But the record contained

15   no evidence of industry standards to support the district court's conclusion.  Miller v.

16   Florida Mining & Materials (In re A.W. Assocs., Inc.), 136 F.3d 1439, 1441 n.5 (11th Cir.

17   1998).

18          The Eleventh Circuit reversed and remanded, holding that "t]he bankruptcy court

19   erred in failing to consider industry standards in determining whether the disputed

20   transfer satisfied the provisions of § 547(c)(2).  A.W. Assocs., 136 F.3d at 1443.  In so

21   holding, the court explained that § 547(c)(2)(C)'s requirement that the bankruptcy court

22   examine industry standards serves a two-fold purpose:

23          (1) comparison to industry standards serves the evidentiary function of providing
            a basis to evaluate the parties' self-serving testimony that an extraordinary
24          transaction which was in fact intended as a preference towards a particular
            creditor was instead part of a series of transactions within a business
25          relationship; and (2) reference to industry standards reassures other creditors
            that deals have not been worked out favoring a particular creditor, which would
26          permit a preference to slide under the § 547 fence.

27

1   <u>Id.</u> at 1442 n.10.  <u>See</u> <u>Matter of Tolona Pizza Prods. Corp.</u>, 3 F.3d 1029, 1032 (7th Cir.

2   1993).  The court concluded that:

3       Industry standards do not serve as a litmus test by which the legitimacy of a
        transfer is adjudged, but function as a general backdrop against which the
4       specific transaction at issue is evaluated.

5   <u>Id.</u> at 1443.  The Eleventh Circuit reasoned that "an interpretation of § 547(c)(2)(C)

6   which focuses exclusively on the relationship between the creditor and the debtor would

7   deprive subsection (c)(2)(C) of any independent meaning because subsection (c)(2)(B)

8   already requires that the payment be evaluated in the context of the ongoing

9   relationship between the debtor and the creditor." <u>Id.</u> at 1442.

10      In its post-submission brief, ICMA points to <u>Jan Weilert</u> arguing that "[t]his

11  situation is surely not the type of transaction which is so uncommon, so unusual, so

12  aberrational, so idiosyncratic and so far outside the range of ordinary terms such as to

13  subject a physician, who provided services in August, 2002 for which he was paid in the

14  middle of the following month, to disgourgement [sic] of over $50,000 as a result of a

15  simple mistake in addressing his check."[9]  However, other than the narrow exception

16  carved out for refunds,[10] there is nothing in the Ninth Circuit's decision in <u>Jan Weilert</u>

17  _____

18  [9] ICMA's Supplemental Trial Brief, p.6, l.26 to p.7, l.3.

19  [10] In <u>Jan Weilert</u>, Bank of the West mailed a cashier's check to the debtor after the debtor sold a new RV.
    Several days later, the bank mistakenly made a second payment by direct deposit into the debtor's
20  account.  When the bank discovered the error, it contacted the debtor and requested a refund of the
    second payment.  Three days later, the debtor issued a refund to the bank.  At trial, Bank of the West
21  presented evidence that the recovery was accomplished according to procedures the bank had
    established for recovering such payments.  The bankruptcy court held that the refund payment was made
22  in the ordinary course of business.  <u>Jan Weilert</u>, 245 B.R. at 389.  The district court reversed, holding that
    Bank of the West had failed to produce "evidence of the standard practices other lenders in the industry
23  use to recover double payments."  <u>Jan Weilert</u>, 315 F.3d at 1200.  The Ninth Circuit reversed the district
    court, stating  held:

24      While we hold to the rule that evidence as to the range of industry practice is ordinarily required,
        the problem of refunds of mistaken payments is exceptional.  Like all recipients of mistaken
25      payments, Debtor was subject to a legal obligation promptly to refund the money.  It fulfilled this
        obligation by issuing a refund check within three days, which would clearly have fallen within the
26      ordinary range no matter what the relevant industry or practice.  Here, the 'ordinariness' of the
        Debtor's compliance with its legal obligation is obvious, and additional evidence of industry
27

- 12 -

1  which relieves a creditor of its burden under § 547(c)(2)(C) to provide some evidence of

2  industry standards upon which the court can make a finding that a particular transfer

3  either falls within "the *broad range* of terms that encompasses the practices employed"

4  by similarly situated debtors and creditors or "is so unusual or uncommon 'as to render

5  it an aberration in the relevant industry.'" Jan Weilert, 315 F.3d at 1198. The court

6  declines ICMA's invitation to make such a finding under § 547(c)(2)(C) in this case

7  without evidence of industry standards.

8        Based on the foregoing, the court finds that ICMA did not establish each of §

9  547(c)(2)'s elements by a preponderance of the evidence, and therefore, is not entitled

10  to an ordinary course defense against Diamond's preference claim.

11                              <u>CONCLUSION</u>

12        For the foregoing reasons, the court will enter judgment awarding the sum of

13  $48,195.60 to Diamond pursuant to § 547(b), together with prejudgment interest from

14  December 21, 2004, to entry of judgment, and costs of court. A separate judgment will

15  be entered consistent with this opinion.

16  DATED:

17        SEP 0 6 2006                    _____
                                          PETER H. CARROLL
18                                        United States Bankruptcy Judge

19

20

21

22

23        practice could not have assisted the court in recognizing that the refund was 'made according to
          ordinary business terms.' The law does not inflexibly demand form over substance.
24
25  Jan Weilert, 315 F.3d at 1199, <u>as amended</u>, 326 F.3d 1028, 1029-30 (9th Cir. 2003). The Ninth Circuit
    held that "additional evidence of industry standards is not necessary under § 547(c)(2)(C), when the
26  transferee can prove that (1) money was mistakenly transferred to the debtor, (2) the mistake was quickly
    discovered, (3) a refund was immediately requested, and (4) the refund was tendered within three days.
27  Jan Weilert, 315 F.3d at 1200. The refund exception is not applicable in this case.

                                    - 13 -

**NOTE TO USERS OF THIS FORM:**
*Physically attach this form as the last page of the proposed Order or Judgment.*
*Do **not** file this form as a separate document.*

| In re INLAND GLOBAL MEDICAL GROUP, INC., | CHAPTER 7 |
|---|---|
| Debtor. | CASE NUMBER RS 04-02194 PC |

## NOTICE OF ENTRY OF JUDGMENT OR ORDER
## AND CERTIFICATE OF MAILING

TO ALL PARTIES IN INTEREST ON THE ATTACHED SERVICE LIST:

1.    You are hereby notified, pursuant to Local Bankruptcy Rule 9021-1(a)(1)(E), that a judgment or order entitled *(specify)*: MEMORANDUM DECISION

was entered on *(specify date)*:    SEP - 7 2006

2.    I hereby certify that I mailed a copy of this notice and a true copy of the order or judgment to the persons and entities on the attached service list on *(specify date)*:    SEP - 7 2006

Dated:    SEP - 7 2006

**JON D. CERETTO**
**Clerk of the Bankruptcy Court**

By: _____
         *Deputy Clerk*

Service List


Sandor T. Boxer, Esq.
Law Offices of Sandor T. Boxer
12400 Wilshire Blvd., Suite 1300
Los Angeles, CA 90025


Stephen R. Wade, Esq.
Law Offices of Stephen R. Wade
400 N. Mountain Avenue, Suite 214B
Upland, CA 91786